24-2424
*United States v. Dralle*

# United States Court of Appeals
## for the Second Circuit

———————————————————————

August Term 2025

Argued:  March 18, 2026     Decided:  May 12, 2026

No. 24-2424

———————————————————————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

CHASE DRALLE,  AKA CHEVY,

*Defendant-Appellant,*

STEFAN BAGLEY, JR., TREMAYNE FERGUSON,  AKA TRE, JEFFREY
CHARLESTON,  AKA J DOT, JAMAINE ADKINS, JR.,  AKA G BANGER,
JR., ESKAVAIL GORDON,  AKA VAIL,

*Defendants.*[*]

———————————————————————

Before:     SULLIVAN, BIANCO, and ROBINSON, *Circuit Judges*.

Defendant-Appellant Chase Dralle appeals from the judgment of the United
States District Court for the District of Connecticut (Omar A. Williams, *Judge*),

———————————————————

[*] The Clerk of Court is respectfully directed to amend the caption as reflected above.

following his guilty plea to one count of illegal receipt of a trafficked firearm, in violation of 18 U.S.C. § 933(a)(2) and 933(b).  The district court sentenced Dralle principally to 30 months' imprisonment, which was above the advisory range of 12 to 18 months' imprisonment under the United States Sentencing Guidelines (the "Guidelines"), followed by three years of supervised release.

On appeal, Dralle argues that, in imposing an above-Guidelines sentence, the district court procedurally erred by considering:  (1) uncharged conduct by Dralle while on bail that was not proven by a preponderance of the evidence; and (2) a co-defendant's participation in two shootings that did not arise from any joint criminal undertaking or conspiracy between him and Dralle.  Dralle further contends that the district court's sentence was procedurally and substantively unreasonable because the reasons articulated by the district court did not justify the extent of the upward variance from the advisory Guidelines range and resulted in a shockingly high sentence.

We conclude that the district court plainly erred in considering the co-defendant's criminal activity in arriving at Dralle's sentence, as there was no allegation that they participated in any joint criminal undertaking or conspiracy or that Dralle was even aware of that prior activity by the co-defendant.  Although the district court stated that the co-defendant's participation in two shootings provided context to the nature and circumstances of Dralle's offense, we are unable to discern how the co-defendant's prior violent activities had relevance to Dralle's receipt of a firearm from the co-defendant, and the district court failed to articulate a proper basis for consideration of the co-defendant's violent conduct in Dralle's sentence under any of the factors set forth in 18 U.S.C. § 3553(a).  Because we conclude that this plain error warrants remand and resentencing, we need not determine whether any other of the alleged procedural errors amounted to plain error, or whether the 30-month sentence was substantively unreasonable.  In particular, with respect to his separate challenge to the district court's consideration of his alleged uncharged conduct while on bail, Dralle will have the opportunity at the resentencing to raise any objections to the district court's consideration of that alleged conduct and, if he does so, the district court will be required to make a determination of whether the government has proven that conduct by a preponderance of the evidence.

Accordingly, we **VACATE** the sentence imposed and **REMAND** the case with instructions that the district court conduct a full resentencing consistent with

this opinion.

Judge Sullivan dissents in a separate opinion.

> FOR APPELLEE: KENNETH L. GRESHAM, (Nathan J. Guevremont and Conor M. Reardon, *on the brief*), Assistant United States Attorneys, *for* David X. Sullivan, United States Attorney for the District of Connecticut, New Haven, Connecticut.
>
> FOR DEFENDANT-APPELLANT: KATHLEEN E. DION, (Scott T. Garosshen, *on the brief*), Robinson & Cole LLP, Hartford, Connecticut.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Chase Dralle appeals from the judgment of the United States District Court for the District of Connecticut (Omar A. Williams, *Judge*), following his guilty plea to one count of illegal receipt of a trafficked firearm, in violation of 18 U.S.C. § 933(a)(2) and 933(b). The district court sentenced Dralle principally to 30 months' imprisonment, which was above the advisory range of 12 to 18 months' imprisonment under the United States Sentencing Guidelines (the "Guidelines"), followed by three years of supervised release.

On appeal, Dralle argues that, in imposing an above-Guidelines sentence, the district court procedurally erred by considering: (1) uncharged conduct by Dralle while on bail that was not proven by a preponderance of the evidence; and

3

(2) a co-defendant's participation in two shootings that did not arise from any joint criminal undertaking or conspiracy between him and Dralle. Dralle further contends that the district court's sentence was procedurally and substantively unreasonable because the reasons articulated by the district court did not justify the extent of the upward variance from the advisory Guidelines range and resulted in a shockingly high sentence.

We conclude that the district court plainly erred in considering the co-defendant's criminal activity in arriving at Dralle's sentence, as there was no allegation that they participated in any joint criminal undertaking or conspiracy or that Dralle was even aware of that prior activity by the co-defendant. Although the district court stated that the co-defendant's participation in two shootings provided context to the nature and circumstances of Dralle's offense, we are unable to discern how the co-defendant's prior violent activities had relevance to Dralle's receipt of a firearm from the co-defendant, and the district court failed to articulate a proper basis for consideration of the co-defendant's violent conduct in Dralle's sentence under any of the factors set forth in 18 U.S.C. § 3553(a). Because we conclude that this plain error warrants remand and resentencing, we need not determine whether any other of the alleged procedural errors amounted to plain

4

error, or whether the 30-month sentence was substantively unreasonable. In particular, with respect to his separate challenge to the district court's consideration of his alleged uncharged conduct while on bail, Dralle will have the opportunity at the resentencing to raise any objections to the district court's consideration of that alleged conduct and, if he does so, the district court will be required to make a determination of whether the government has proven that conduct by a preponderance of the evidence.

Accordingly, we **VACATE** the sentence imposed and **REMAND** the case with instructions that the district court conduct a full resentencing consistent with this opinion.

## BACKGROUND

### I. The Investigation

The investigation into Dralle arose from an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives into his co-defendant, Stefan Bagley. On July 26, 2023, Bagley and one other individual were separately dropped off at a hospital in Bridgeport, Connecticut—each with a gunshot wound. Bagley declined to provide investigators with any information about how he was injured. Upon review of surveillance footage from the area of one of the shootings,

investigators concluded that a passenger of a vehicle registered to Bagley had shot the other individual. Investigators then obtained a warrant to search Bagley's vehicle, where they discovered eleven empty firearm cases and several receipts for firearm purchases. Further investigation revealed that Bagley had purchased approximately twenty firearms in the previous ten months. After observing him on surveillance video stealing ammunition when purchasing a firearm, investigators obtained a warrant for Bagley's arrest.

On October 27, 2023, Bagley was arrested while attempting to purchase another firearm. At the time of Bagley's arrest, investigators also seized his cellphone. Messages retrieved from Bagley's cellphone revealed that approximately two months before Bagley's arrest, he had purchased a pistol for Dralle for $760.

## II.    Dralle's Arrest and Guilty Plea

On December 12, 2023, a grand jury returned a twelve-count superseding indictment charging Dralle and five co-defendants, including Bagley, with various firearms offenses. Dralle was charged in only one of those counts—Count Ten— which charged him with receipt of a trafficked firearm, in violation of 18 U.S.C. § 933(a)(2) and 933(b), arising from his August 2023 purchase of a pistol from

Bagley. Dralle was arrested six days later and was released pending trial. The order setting the conditions of his release required, *inter alia*, that Dralle not violate any federal, state, or local law while on release.

On May 2, 2024, Dralle pled guilty to Count Ten pursuant to a plea agreement. The parties stipulated that Dralle's advisory Guidelines range was 12 to 18 months' imprisonment. Dralle remained on release pending sentencing, which was scheduled for August 26, 2024.

### III. The August 5, 2024 Incident and Bail Revocation Hearing

On August 14, 2024, the United States Probation Office submitted a petition to the district court seeking an arrest warrant for Dralle for violating the conditions of his pretrial release in Trumbull, Connecticut. The petition was based on a police report from the Trumbull Police Department, which was summarized by the Probation Office in the petition. The petition noted that the "Trumbull Police Department advised that the matter was under investigation and that they would provide more information once obtained." Gov't App'x at 27.

According to the petition's summary of the relevant police report, on the evening of August 5, 2024, officers responded to a report of an assault at a gas station in Trumbull, Connecticut. Upon arrival, officers encountered the

complainant, "whose face showed significant bruising and lacerations around both eyes and surrounding areas of his face." *Id*. The officers also observed that one of the complainant's earrings appeared to have been torn from his ear.

The petition then summarized the complainant's statements to the police about the incident, as reflected in the police report. In particular, he was parked at the gas station speaking on his cellphone when a blue SUV pulled into an adjacent space and multiple people exited the vehicle. One of those people—later identified as Dralle—began shouting at the complainant. A verbal altercation ensued and Dralle then spit in the complainant's face and punched him. After Dralle and the complainant exchanged further punches, Dralle returned to his vehicle, but the verbal dispute continued. Several minutes later, as the complainant attempted to enter the gas station and waited to be admitted, the SUV pulled up alongside him and Dralle again spat in his direction. The complainant then approached Dralle and punched him, at which point all three occupants of the vehicle exited and began assaulting the complainant—punching and kicking him. One person ripped the complainant's necklace off, and another tried to remove his wallet from his pocket. Dralle and the other two individuals then retreated to the SUV and drove away. According to the petition submitted by the

Probation Officer, Trumbull Police Officers "reviewed CCTV footage" of the incident and concluded that "the complainant's account appeared to be accurate." *Id.* The petition also noted that the Trumbull Police Department intended to seek an arrest warrant for Dralle, charging him with Assault in the Second Degree, Criminal Attempt to Commit Robbery in the Third Degree, and Breach of Peace in the Second Degree.

On August 15, 2024, the district court reviewed and signed the petition, ordering that a warrant be issued to compel Dralle to show cause why his bond should not be modified or revoked. On August 21, 2024, Dralle was arrested on the federal warrant and brought before the assigned magistrate judge for a bond revocation hearing. At that hearing, the government conceded that state authorities had not yet sought an arrest warrant for Dralle but argued that there was sufficient probable cause to believe that Dralle committed state crimes and thus his pretrial release should be revoked. In response, defense counsel emphasized that Dralle was presumed innocent, had not even been charged in connection with the alleged incident at the gas station, and was otherwise fully compliant with the conditions of his pretrial release.

The magistrate judge concluded that there was probable cause to believe

that Dralle committed state crimes in connection with the altercation at the gas station. The magistrate judge also noted his "concern[s]" about the truthfulness of Dralle's statements contained in documents submitted in connection with the original bail determination about (1) whether he was actually employed at his father's business, (2) whether his father had past felony convictions, and (3) whether Dralle had any financial assets. Joint App'x at 37–39. Given this probable cause finding and the concerns about Dralle's truthfulness, the magistrate judge determined that there were no bail conditions that would assure the safety of the community and revoked Dralle's bail, remanding him into custody pending sentencing.

## IV. Dralle's Sentencing

Just five days later, Dralle appeared before the district court for sentencing. After briefly reciting the applicable maximum penalties for the offense that Dralle admitted, the district court immediately pivoted to discuss Dralle's history on pretrial release. It stated:

> When someone is not in custody, when they appear before me when entering a criminal guilty plea, I usually remind them that they have the rare opportunity to prove to the Court what sentence they deserve. Here, Mr. Dralle was remanded to custody because of an August 5 incident being investigated by the Trumbull Police

Department. It was reported that Mr. Dralle was at a gas station standing outside a vehicle with two other people at least, when he allegedly told someone who had been talking on his cellphone while parked in his own vehicle, that Mr. Dralle didn't like the way the person was looking at them and accused him of being cowardly, but in more colorful language. And then, ironically, outnumbering that individual, Mr. Dralle is alleged to have assaulted that individual along with the two other people that were with him; a three-on-one fight in which Mr. Dralle is accused of spitting in the person's face, and the people who were there with him are accused of trying to steal the victim's wallet and necklace, all while captured on video.

Joint App'x at 79–80. Defense counsel did not specifically object to this recitation of the August 5th incident.

Although the district court correctly noted that Dralle was "not being sentenced for that additional alleged criminal conduct," it specifically noted that it "shapes what the Court should do [at sentencing]" and "tells [the district court] what sentence [Dralle] deserve[s]." Joint App'x at 80.

The district court then heard argument from the parties. The government sought a sentence of 18 months' imprisonment, and defense counsel sought a sentence of supervised release. Defense counsel began her argument recognizing that "there have been substantial charges since this defendant last appeared" before the district court and noted that "his family . . . as well as [defense counsel were] angry and disappointed in him." Joint App'x at 88. The district court

11

interjected and asked why letters submitted by family members between the bail revocation hearing and the sentencing hearing did not address the incident at the gas station. Defense counsel explained that she advised both Dralle and his family to remain silent on the issue of "what may or may not have happened in Trumbull" because any statement could "be used against [Dralle] in [a potential] State Court proceeding[]." Joint App'x at 89.

> The district court also then posed a series of rhetorical "what if" questions:

> I'm not going to ask Mr. Dralle these questions, but reading through those allegations, I'm sure the question that comes to anyone's mind; what if his guy had a gun? What if he pulled that firearm? [. . .]

> What if he shot one of the people with Mr. Dralle and shot some little kid who is in the car with their parent? What if someone in the vehicle had a firearm and maybe that's why he was acting so tough, three to one, right? Especially in light of these allegations for which he's pleaded guilty. What if somebody in that vehicle had a firearm? And we will not know because there was not an arrest on-site. So maybe that is why they feel so tough. What if one of them pulled a gun during this altercation and shot and killed that victim after he was spit in the face by Mr. Dralle, right? What if one of those other people shot and killed this guy? Does Mr. Dralle understand whether he could have been exposed to being prosecuted for felony murder, a 25-year minimum in prison because he's engaged in a felony in a three-to-one physical altercation because the people he is with who are trying to rob this guy?

> So I'm not going to ask those questions. I don't have to ask those questions. I hope he's considered those questions. Frankly, whether he speaks to it or not, it's his conduct that decides what sentence he

deserves.  And so I can hear about remorse and the, you know, how he's learned from this experience or learned from the couple of weeks he sat in jail, but frankly, it's his conduct that is going to drive the sentence he receives.

Joint App'x at 90–91.

In response, defense counsel volunteered that when she met with Dralle in custody between the bail revocation hearing and the sentencing hearing that she "read the riot act to him," "went through . . . that his behavior . . . was wrong" and that she thought "he took [it] to heart."  Joint App'x at 92.

Later in the sentencing hearing, after defense counsel argued that Dralle was immature when he committed the offense he pled guilty to, and that spending time in prison would not help his maturation, the district court interjected:  "Well, apparently neither did being out of prison. . . . And so at least when he's in prison we won't have somebody sitting at a gas station at 11:30 at night getting jumped by three people, getting his earring ripped out or whatever else that happened."  Joint App'x at 96.

After hearing from Dralle and Dralle's mother, the district court then articulated the reasoning for its sentence.  The district court's reasoning began as follows:

Mr. Dralle, you talk about anxiety that you have experienced during

13

your incarceration. But I know your lawyer has advised you not to talk about August 5th, but imagine the anxiety of the person being outnumbered three to one at 11:00 at night at a gas station. Imag[ine] that anxiety. And in prison, presumably you have correctional officials to ensure your safety. This person didn't. And yet you mention doing everything that you can since December, the date that you were arrested and released. But is that really what your actions have shown, that you have been doing everything in your power to avoid incarceration? There's no way.

You talk about needing to schedule your GED test. You have been out since December. You have been out since December. It doesn't sound like at 11:30 at night on August 5th that you were out trying to schedule your GED test. You know better; if your mother was in law enforcement, specifically involved in pistol permitting, you definitely knew better. On August 5th, you knew better and, you know, that if you don't do better this is where you wind up.

Joint App'x at 112–13.

The district court also explicitly mentioned that in connection with "the nature and circumstances" of Dralle's offense, it "has to consider" the "greater context of Mr. Bagley's activities," including that his vehicle was involved "in two separate shooting incidents," as well as Dralle's own "activities on August 5 as alleged by the government." Joint App'x at 113–14. The district court nonetheless acknowledged that Dralle was "not being sentenced here for those things" but stated that it "can't ignore that context in assessing what it is you are accused of doing." *Id.* at 114.

14

Ultimately, the district court sentenced Dralle principally to 30 months' imprisonment followed by three years of supervised release. This appeal followed.

## DISCUSSION

On appeal, Dralle argues, *inter alia*, that the district court committed procedural error by considering: (1) the uncharged conduct at the Trumbull gas station without the requisite finding that the allegations regarding his conduct had been proven by the government by a preponderance of the evidence; and (2) the violent activities of co-defendant Bagley, especially given the absence of any allegation that such conduct was jointly undertaken or part of a conspiracy between them.

Although the procedural reasonableness of a sentence is typically reviewed for abuse of discretion, *see United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc), we apply the more deferential plain error standard to Dralle's procedural claims because he did not raise them before the district court, *see United States v. Williams*, 998 F.3d 538, 540 (2d Cir. 2021) (per curiam). Under the plain error standard, the defendant must demonstrate "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected

15

[the defendant's] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (second alteration in original) (internal quotation marks and citation omitted).

## I. Consideration of Dralle's Uncharged Conduct

Dralle contends that the district court erred in considering "conduct [at the Trumbull gas station] that had not been charged, admitted to by [him], or proven by a preponderance of the evidence at the sentencing hearing." Appellant's Br. at 15.

"In deciding upon a sentence, a district court has the discretion to rely on the wide array of facts before it, including information set forth in the pre-sentence report, as well as evidence that would not be admissible at trial, so long as the defendant is given an opportunity to contest the accuracy of that information." *United States v. Cossey*, 632 F.3d 82, 86 (2d Cir. 2011). As part of that broad discretion, "[a] sentencing court is not limited to considering only evidence of the convicted offense; it may take into account other relevant conduct." *United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007); *see also* U.S.S.G. § 1B1.3 cmt. ("Conduct

that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").

However, we have emphasized that "there are distinct limits to this discretion, and they include a defendant's due process right to be sentenced based on accurate information" and "factual matters considered as a basis for [a] sentence must have some minimal indicum of reliability beyond a mere allegation." *Juwa*, 508 F.3d at 700–01 (alteration adopted) (internal quotation marks and citation omitted). Moreover, "[w]e have held that facts relevant to sentencing must be found by a preponderance of the evidence." *Id*. at 701; *see also Cossey*, 632 F.3d at 88 ("It is uncontroversial to conclude that a sentencing decision that relies on factual findings that were unsupported in the record, and thus could not possibly have been established by a preponderance of the evidence, seriously affects the fairness, integrity, and public reputation of judicial proceedings."). In resolving factual disputes under that standard, the district court is afforded broad discretion as to what types of procedure are needed, including whether a full evidentiary hearing is required. *See United States v. Guldi*, 141 F. 4th 435, 450 (2d Cir. 2025).

Here, the district court never made a finding that the uncharged alleged

17

conduct at the gas station was proven by the government by a preponderance of the evidence. Indeed, it is not entirely clear what information the district court considered before it decided to increase Dralle's sentence because of the uncharged alleged conduct. The uncharged alleged conduct was not described in the Pre-Sentence Report ("PSR"), and the government did not offer any evidence at the sentencing related to that conduct. Instead, it appears that the district court's knowledge of these allegations was based upon the petition from the Probation Office to the district court seeking a warrant for Dralle's re-arrest for violation of bail in light of those allegations. That warrant application summarized a police report containing statements by the complainant from the gas station incident about Dralle's conduct.[1] To be sure, during the sentencing, the district court also made several references to a video of the incident. However, the district court did not indicate that it had received the video or reviewed it; rather, it indicated that "it was reported that it's on video." Joint App'x at 104. The only information regarding the video was contained in the petition which, in the course of

---

[1] Although the district court did not provide Dralle's counsel with a copy of the petition for the arrest warrant or the police report at the sentencing (if the district court had that report), defense counsel had obtained a copy of those documents in connection with the bail revocation proceeding.

18

summarizing the police report, noted the report's statement that "[o]fficers reviewed CCTV footage and the complainant's account appeared to be accurate." Gov't App'x at 27.

The government argues that the district court could rely upon the petition to find that Dralle engaged in the alleged conduct at the gas station because the petition was summarizing the police report. However, "[p]olice reports are not presumed to be categorically reliable." *United States v. Jordan*, 742 F.3d 276, 280 (7th Cir. 2014); *United States v. Harrison*, 809 F.3d 420, 424 (8th Cir. 2015) ("Whether a police report is sufficiently reliable is a question we examine on a case-by-case basis, considering all the relevant circumstances . . . .") (internal quotation marks and citation omitted); *United States v. Padilla*, 793 F. App'x 749, 756 (10th Cir. 2019) ("Not every police report satisfies the reliability floor.").

With respect to this requirement, the government suggests that the police report in this case contained sufficient indicia of reliability—namely, the "complainant's recollection and the information obtained by officers after reviewing security footage." Appellee's Br. at 29. In doing so, the government overlooks the fact that the district court (1) never identified the information upon which it was relying (including whether it had reviewed the police report or the

19

video or only the Probation Office's summary of the report); (2) never made any determination regarding the reliability of any information it was considering regarding the alleged incident; and (3) never made a finding that the information satisfied the preponderance of the evidence standard. *See United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000) ("The Supreme Court has observed that the 'preponderance of the evidence' is the generally applicable standard for a sentencing judge to employ when deciding the weight and effect to accord relevant, uncharged conduct at sentencing.") (citing *United States v. Watts*, 519 U.S. 148, 156–57 (1997) (per curiam) and *McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986)); *see also United States v. Maturo*, 982 F.2d 57, 62 (2d Cir. 1992) (vacating the defendant's sentence and remanding for resentencing where district court did not make "explicit affirmative findings of fact" regarding the amount of narcotics involved in the offense, but rather implicitly accepted the factual findings in the PSR).

As the Tenth Circuit aptly explained,

[I]f a class of documents—such as police complaints or police reports—is not inherently reliable, then it makes sense that any individual document within that class cannot be *assumed* to be sufficiently reliable to establish a sentencing fact. Rather, there must be a finding that the *specific* document at issue contains sufficient

indicia of reliability to support the probable accuracy of the information it is being offered to establish. And such a finding is logically appropriate only where the document has been entered into evidence so that the district court may, on the record, assess factors bearing on the document's veracity such as the level of detail, internal consistency, and overall quality of that document.

*Padilla*, 793 F. App'x at 759; *see also id.* (holding that "the district court clearly erred in finding that [the defendant committed uncharged conduct] by merely relying on the contents of a police report that had not been entered into evidence"); *see also Jordan*, 742 F.3d at 281 ("Where the district court did not determine the [police] report was reliable, its detail alone does not allow us to hold independently that it was."). In short, to the extent the district court relied upon information in the police report (or the petition summarizing the police report) to establish that the uncharged conduct occurred, it erred by failing to make a determination as to the reliability of the information contained in the police report, as well as whether such evidence met the preponderance of the evidence standard.

The government suggests no such findings were necessary because of Dralle's "apparent embrace of the petition['s] facts" surrounding his alleged conduct during the Trumbull incident. Appellee's Br. at 32. As an initial matter, we note that the district court did not ask Dralle or his counsel whether they had

21

any factual objections to the allegations asserted by the government in connection

with the Trumbull incident.  Moreover, notwithstanding the absence of a specific

objection to the district court's consideration of the uncharged conduct, there is an

insufficient basis in the record for us to conclude that Dralle agreed with the details

of his alleged involvement in the Trumbull incident.  Instead, defense counsel

explained to the district court why Dralle would not be addressing the Trumbull

incident during the sentencing—namely, given the possibility of new state charges

being brought in connection with that incident, she had advised Dralle and his

family not to make any comments about it.  In particular, defense counsel told the

district court:

> So, Your Honor, I met with the defendant over the weekend.  I also
> spoke with his mother.  I advised the defendant very strongly, and I
> hope that he sticks with this, that the Trumbull incident is, there's a
> possibility of an arrest.  Anything he says, any comments that he
> makes with regard to that incident whatsoever, can be used against
> him, and I advised him not to address that issue.  And if the Court
> questions him about it, I'll advise him that he has the right to remain
> silent and that anything he says in this courtroom with regard to what
> *may or may not have happened in Trumbull* can be used against him in
> State Court proceedings.

Joint App'x at 89 (emphasis added).  That statement was hardly an indication that

Dralle was stipulating or agreeing to the allegations made by the government in

22

connection with his conduct during the incident.[2]

The government also points to the fact that defense counsel indicated to the district court that she "read the riot act to [Dralle]" during their discussion about the Trumbull incident, including "[going] through [with Dralle] everything that his behavior, how it was wrong, the steps that were wrong, from beginning to end." *Id.* at 92. The government contends that "defense counsel's remarks at sentencing reflected evident *agreement* that Dralle had been involved in the violent altercation as described." Appellee's Br. at 31 (emphasis in original).

We are unpersuaded. Defense counsel's remarks could have been reasonably construed to reflect disappointment in the fact that Dralle had shown poor judgment in associating with certain individuals and/or placing himself in a position where he could be accused of participating in an altercation and assault, as well as failing to extricate himself from that situation once it developed, rather than being construed as agreement that he was the aggressor in that incident.

---

[2] Interestingly, when Dralle's mother spoke on his behalf at sentencing and was questioned by the district court about the Trumbull incident, she highlighted the fact that that she was "not sure" what happened at the gas station in Trumbull on August 5th, and noted that it "ha[dn't] gone to court," Dralle "ha[dn't] been arrested for it and [she didn't] know what proof there is," and "he ha[d] not been found guilty or anything like that." Joint App'x at 100. Immediately after this statement, the district court noted that "[t]here's video evidence [of the incident] according to the parties." *Id*.

Thus, even if her statement indicated agreement that Dralle was involved with his friends in an altercation or dispute during the Trumbull incident, it could hardly be construed as a concession that all of the allegations as described by the district court, including Dralle's personal involvement in an unprovoked assault and attempted robbery, were undisputed. *See, e.g.*, Joint App'x at 104 (the district court, in summarizing the allegations, stating that "Mr. Dralle, unprovoked, had a dispute with somebody else, spat in their face, assaulted them, and he and two other people he was with assaulted this person, three on one; that the two people he was with tried to steal the person's necklace and wallet, and it was caught on video."); *id*. at 91 ("What if one of those other people shot and killed this guy? Does Mr. Dralle understand whether he could have been exposed to being prosecuted for felony murder, a 25-year minimum in prison because *he's engaged in a felony in a three-to-one physical altercation because the people he is with who are trying to rob this guy?*") (emphasis added); *id*. at 96 ("And so at least when he's in prison we won't have somebody sitting at a gas station at 11:30 at night *getting jumped by three people, getting his earring ripped out or whatever else happened.*") (emphasis added); *id*. at 102 (referring to the August 5th incident as "beating up an innocent person").

24

Indeed, there is no indication that the district court interpreted Dralle's silence or defense counsel's remarks as a concession regarding those alleged details of the incident. To the contrary, when the district court explained its consideration of the Trumbull incident in arriving at its sentence, it referred to, *inter alia*, "[Dralle's] activities on August 5 *as alleged by the government*" and further emphasized that it "[couldn't] ignore that context in assessing what it is [Dralle was] *accused of doing*." Joint App'x at 114 (emphasis added); *see also id*. at 90 (the district court's reference to "reading through *those allegations*" regarding the Trumbull incident) (emphasis added). Thus, even though Dralle never stipulated or agreed to the details of his alleged conduct during the Trumbull incident and the district court appeared to view them as allegations, it nevertheless never made any determination as to the reliability of those allegations of uncharged conduct under the preponderance-of-the-evidence standard before considering those allegations in arriving at its sentence.[3]

---

[3] We note that the government cannot meet this evidentiary standard by merely relying upon the magistrate judge's determination, in the context of the bail revocation hearing, that "[t]here [was] ample probable cause to believe that on August 5, 2024, defendant and other associates committed a violent assault of a third party, that the victim suffered injuries and that the confrontation that ultimately led to the assault was instigated by the

25

To be sure, we recognize that, under Federal Rule of Criminal Procedure 32(i)(3)(B), the district court's fact-finding obligation is only triggered "for any disputed portion of the presentence report or other controverted matter." *See United States v. Thompson*, 76 F.3d 442, 456 (2d Cir. 1996) ("As to facts disputed in connection with sentencing, the court is required to make findings sufficient to permit appellate review. It is sufficient for these purposes if the court indicates, either at the sentencing hearing or in the written judgment, that it is adopting the recommendations in the PSR.") (internal citations omitted); *see also United States v. Rodriguez-Delma*, 456 F.3d 1246, 1254 (10th Cir. 2006) (finding that "because [the defendant] failed to make any allegations of factual inaccuracy [to the PSR], the district court's fact-finding obligation under Rule 32(i)(3)(B) was never triggered").

However, here, none of the procedural safeguards that exist in Rule 32, with respect to objections to a PSR, were utilized in connection with the district court's

---

defendant." Gov't App'x at 8. As we have explained, "[w]hile the evidentiary standard at sentencing is more relaxed than at trial, and the burden of proof on the government is a preponderance of the evidence and not beyond a reasonable doubt, probable cause is a lower standard than preponderance of the evidence; it requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Juwa*, 508 F.3d at 701 (internal quotation marks and citation omitted).

consideration of Dralle's uncharged conduct to ensure it was uncontroverted. In other words, the alleged uncharged conduct was not put in an addendum to the PSR, nor did the district court even identify to Dralle what document it was considering in connection with the allegations. In the absence of any such addendum or document, as noted *supra*, the district court never asked Dralle whether he had reviewed the allegations of uncharged conduct with his attorney or whether there were any factual objections to that alleged conduct, as would occur with respect to an addendum to a PSR. *See generally* Fed. R. Crim. P. 32(i)(1)(A) (explaining that, at sentencing, the district court "must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report"); *cf. Rodriguez-Delma*, 456 F.3d at 1253–54 (emphasizing, in finding that the district court's fact-finding obligation was not triggered, that defense counsel was questioned in detail regarding the "undisputed facts" in the PSR and, after the court described those facts, counsel stated that the court had "summarized everything quite well"). In short, because of the manner in which the district court's consideration of the uncharged conduct unfolded at the sentencing, we are hesitant to conclude that all of the detailed allegations regarding the uncharged conduct were undisputed, such that the

27

district court was relieved of its obligation to assess the reliability of the evidence upon which it relied and its obligation to determine whether the evidence was sufficient to satisfy the preponderance-of-the-evidence standard.

However, we need not resolve whether the district court's consideration of the uncharged conduct under these circumstances amounted to a clear or obvious error, or whether any such error affected Dralle's substantial rights and the fairness of his sentencing, because, as discussed *infra*, we conclude that a full resentencing is separately required because of the district court's plain error with respect to its consideration of the co-defendant's shootings in connection with Dralle's sentence. Thus, before the resentencing, Dralle will have the opportunity to obtain any relevant additional information regarding the Trumbull incident, including seeking to obtain any video of the incident. Moreover, the district court should identify any documents or evidence upon which it intends to rely (whether submitted by the Probation Office or the government) with respect to its consideration of the uncharged conduct and ensure that any such documents or evidence have been provided to the defendant. Finally, at the resentencing, Dralle will have an opportunity to object to the factual accuracy of those allegations upon which the district court intends to rely and challenge the evidence upon which

28

they are based and, if he does so, the district court will need to determine, after giving Dralle an opportunity to be heard, whether the evidence offered by the government is sufficiently reliable to prove those allegations under the preponderance-of-the-evidence standard.

## II.     Consideration of Co-Defendant Bagley's Violent Activities

Dralle asserts that "[t]he district court erred by weighing the shootings Mr. Bagley was involved in during its consideration of the nature and circumstances of Mr. Dralle's offense, despite there being no allegation that the referenced conduct resulted from jointly undertaken criminal activity or any allegation that Mr. Dralle and Mr. Bagley were co-conspirators." Appellant's Br. at 26.

At sentencing, the district court noted that "about three months before [Dralle] decided to purchase a firearm illegally from Mr. Bagley, [Bagley's] vehicle was involved in two separate shooting incidents." Joint App'x at 113. The district court further explained that "Mr. Bagley . . . was shot in one of those incidents . . . [a]nd in another one, there's someone who is alleged to have reached out of his vehicle and shot up another vehicle multiple times striking somebody." *Id*. at 114. After recounting the shootings, the district court stated:

So, yes, you are being convicted of a nonviolent offense, but the Court

29

has to consider the nature and circumstances of your offense and does so with the greater context of Mr. Bagley's activities, the activities of your codefendant, your activities on August 5 as alleged by the government, and I've got to decide what an appropriate sentence is here. You are not being sentenced here for those things, but I can't ignore that context in assessing what it is you are accused of doing.

Thankfully, we are not in that type of situation here; you are not being accused of being involved in any shootings. You are not shot yourself. But it doesn't take a whole lot to go from what it is you are accused of doing and wind up in one of those much worse situations.

*Id*.

"It is well established that a district court may consider the relevant conduct of co-conspirators when sentencing a defendant." *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004). In particular, when calculating a defendant's Guidelines range, a district court may consider "jointly undertaken criminal activity," whether or not that activity is charged as a conspiracy, when the acts or omissions of others were: "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable [to the defendant] in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Thus, we have made clear that "[in] order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the

30

defendant." *Johnson*, 378 F.3d at 238 (internal quotation marks and citation omitted).

Here, as the government conceded at oral argument, the district court would have committed plain error if it had increased Dralle's sentence based on Bagley's shootings because there is no evidence, nor even an allegation, that Dralle and Bagley were co-conspirators or that the shootings occurred within the scope of jointly undertaken criminal activity. Indeed, Dralle purchased the firearm from Bagley after those shootings, and there was no evidence that Dralle even had any knowledge of those prior shootings. *See, e.g., United States v. Burnett*, 827 F.3d 1108, 1121 (D.C. Cir. 2016) (finding plain error where the district court "based [the defendant's] sentence in part on conduct that occurred before he joined the conspiracy"); *see also United States v. Presendieu*, 880 F.3d 1228, 1246 (11th Cir. 2018) (holding that the district court erred in considering conduct by co-conspirator that was not within the scope of any jointly undertaken criminal activity when calculating the defendant's advisory Guidelines range).

Instead, the government argues that the district court properly considered Bagley's shootings for a different and permissible purpose, namely, as "important context in understanding the nature, circumstances, and seriousness of Dralle's

31

offense." Appellee's Br. at 22; *see also id.* at 44 (explaining that "looking to the conduct of others (including criminal associates) to place a defendant's crime in context is different from attributing that conduct to the defendant under the Guidelines"). Accordingly, the government argues that "[t]he incidents involving Bagley helped illustrate why it was so dangerous for someone like Dralle to illegally purchase a gun." Appellee's Br. at 43.

To be sure, though a district court may not hold a defendant accountable for a third party's conduct by increasing the defendant's sentence without finding that the third party's acts were within the scope of the defendant's agreement and were foreseeable to the defendant, a court may consider such conduct to the extent that it is relevant to the Section 3553(a) analysis as it relates *to the defendant*.

However, the mere use of the word "context" by a sentencing judge does not insulate a district court's consideration of a co-defendant's violent conduct from review where the district court does not connect its consideration of such conduct to one or more Section 3553(a) factor. In other words, the district court must articulate how, even though it would be improper to hold the defendant accountable for the co-defendant's conduct by increasing the defendant's sentence without making the findings required under *Johnson*, the co-defendant's activities

32

still could be properly considered for some other reason under the Section 3553(a) factors.

Here, to the extent that the district court imposed the above-Guidelines sentence in part because Bagley's shootings demonstrated the nature and circumstances and/or seriousness of *Dralle's* offense, *see* 18 U.S.C. § 3553(a)(1), (a)(2)(A), there was an insufficient evidentiary basis to do so given the lack of any reasonable foreseeability that Dralle was about to "wind up," as the district court described it, *see* Joint App'x at 114, participating in the same type of violent conduct as Bagley. Indeed, at one point during the sentencing, the district court did suggest that "trafficking of firearms can be related to . . . gang or drug activity in a lot of cases," and further noted that "some might argue that unprovoked violence as is alleged in the Trumbull incident against Mr. Dralle, some might argue that type of unprovoked violence is also suggestive of that type of gang and drug activity without other explanation." Joint App'x at 87. But the government then confirmed to the district court that it was not making any allegation that Dralle was involved in any drug or gang activity. Nor was there any evidence at sentencing advanced by the government that Dralle, who had no criminal record, was purchasing the firearm to further any other type of criminal activity, or that

33

Dralle was knowingly associating with violent individuals.[4]

Moreover, the district court did not point to any other consideration that would permit the district court to consider Bagley's prior shootings as "context" under one of the Section 3553(a) factors. In sum, the district court plainly erred in drawing any inference as to Dralle's potential dangerousness, or the seriousness of his offense, based upon Bagley's participation in two shootings.[5]

---

[4] In response to defense counsel noting that, if Dralle had simply waited a few months for his 21st birthday, he could have applied for a permit and purchased the gun for himself (rather than through Bagley), the district court asked why Dralle needed the gun so quickly, and defense counsel responded: "Because he's young and stupid. I don't have another answer for that. He was driving back and forth from Trumbull to Stamford to work at his father's business. I know there's a lot of gang violence in the Bridgeport area. I don't know how close he is on the Trumbull border to Bridgeport and all the issues that go on in Bridgeport, but he wanted a gun. And his stepfather's nephew, who is Mr. Bagley, I believe, had a permit and was able to purchase guns" legally. Joint App'x at 94.

[5] Although the dissent correctly notes that our precedent does not require a sentencing judge "to engage in the utterance of robotic incantations when imposing sentences in order to assure us that they have weighed in an appropriate manner the various [S]ection 3553(a) factors," *post* at 6 (internal quotation marks and citation omitted), reliance on that precedent is misplaced because we are not remanding for resentencing because the district court failed to recite and address each of the Section 3553(a) factors in arriving at its sentence; rather, the plain error here arises from the district court's failure to explain the basis for its reliance on a co-defendant's violent conduct even though there is no allegation that Dralle was involved in, or even aware of, that conduct. As discussed *supra*, in order to comply with our precedent, the district court needed to do more than vaguely reference its consideration of the co-defendant's violence as "context" for the nature and circumstances of the Dralle's offense under Section 3553(a)(1). Thus, we respectfully

34

In concluding there was plain error, we find inapposite the cases cited by the government to support its position. For example, in a nonprecedential summary order, *United States v. Small*, No. 22-1622, 2024 WL 1173046 (2d Cir. Mar. 19, 2024) (summary order), we concluded that the district court could properly consider specific harms caused by the co-conspirators of the drug business that the defendant operated. In particular, it could consider that one of the defendant's associates who manned the defendant's drug phone and serviced his customers, "led police on a high-speed chase, which resulted in the killing of a bystander and serious injury to two others" and that one of the defendant's associates was killed in "a double homicide that occurred down the street from the house that hosted [the defendant's] drug operation." *Id.* at *1–2. We explained that those incidents "illustrated the dangers associated with the kind of drug trafficking with which [the defendant] was involved." *Id*. at *2. Thus, there was a potential causal link between the defendant's conduct and the clear harm to third parties caused by his

---

disagree with the dissent's suggestion that our holding mandates some type of robotic incantation of each of the sentencing factors by the district court. Instead, our holding requires a district court to sufficiently explain how it properly considered a co-defendant's violence under one or more of the Section 3553(a) factors, which thereby allows us to meaningfully review the district court's exercise of its discretion and ensures that the defendant being sentenced receives the requisite procedural fairness that is a cornerstone of our sentencing jurisprudence.

co-conspirators, thereby bearing on the seriousness of the defendant's offense. Here, in contrast, there is no allegation that Dralle and Bagley were co-conspirators and no possibility that Dralle's receipt of the gun from Bagley could have somehow caused two prior shootings by Bagley.

The government's reliance on our decision in *United States v. Davis*, 82 F.4th 190 (2d Cir. 2023), is likewise misplaced. In *Davis*, in affirming an above-Guidelines sentence for possession of a firearm after having been convicted of a felony, we found no abuse of discretion in the district court's reference to, *inter alia*, "the need to deter a recent rise in local gun violence," where the defendant "agreed [at sentencing] that the court needed to take the rise into consideration" and merely argued on appeal that it gave "the local crime spike too much weight." *Id.* at 200–01 (internal quotation marks and citation omitted). Unlike in *Davis*, there was no reference by the district court, in considering Bagley's shootings, to local crime rates or some need for general deterrence due to Dralle's conduct.

The Seventh Circuit's decision in *United States v. Hatch*, 909 F.3d 872 (7th Cir. 2018) (per curiam), is distinguishable for similar reasons. In *Hatch*, the Seventh Circuit affirmed an above-Guidelines sentence involving the defendant bringing a total of 17 handguns from Indiana to Chicago and "[o]ver the next year, Chicago

36

police recovered five of [those] guns—some from felons and one even from a minor." *Id.* at 874. During the sentencing, the judge gave statistics that attributed the spike in Chicago's homicides to guns from Indiana, noting that 21% of illegal guns recovered in Chicago are traceable to Indiana, where guns laws are less restrictive than in Illinois. *Id.* Given those circumstances, the Seventh Circuit held that the district court acted in its discretion in "conclud[ing] that a rise in local crime made the offense more serious than what the Guidelines contemplated . . . [a]nd in describing Chicago as 'vulnerable' to the flow of guns from Indiana, the judge also appropriately considered the need to deter the illegal transport of guns from a state to another with a gun violence problem." *Id.* at 875. Thus, the circumstances in *Hatch* are far afield from the instant sentencing, where there was no possibility that Bagley's shootings were somehow a by-product of Dralle's later purchase of a pistol from him, or any reference by the district court that such a purchase was facilitating a crime problem that required general deterrence.

In short, because we cannot discern from the record any proper basis for the district court's consideration of Bagley's shootings in sentencing Dralle under the Section 3553(a) factors, the district court plainly erred in doing so. Moreover, there is, at least, a "reasonable probability that, but for the error, the outcome of the

37

[sentencing] would have been different." *Rosales-Mireles v. United States*, 585 U.S. 129, 134–35 (2018) (internal quotation marks and citation omitted). More specifically, in imposing the above-Guidelines sentence, the district court explicitly noted that "it was consider[ing] the nature and circumstances of [Dralle's] offense" and was "do[ing] so with the greater context of Mr. Bagley's activities," as well as Dralle's activities during the Trumbull incident. Joint App'x at 114. Although it is clear that the district court relied more heavily on the Trumbull incident in arriving at the above-Guidelines sentence, there is a reasonable probability, based on the district court's reasoning, that its improper consideration of Bagley's shootings contributed to the upward variance. Therefore, we conclude that the district court's plain error with respect to consideration of those shootings affected the defendant's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See Rosales-Mireles*, 585 U.S. at 141 (emphasizing that the "public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction") (internal quotation marks and citation omitted).

38

## CONCLUSION

Accordingly, we **VACATE** the sentence imposed and **REMAND** the case with instructions that the district court conduct a full resentencing consistent with this opinion.